USDC SDNY
DOCUMENT ELECTRONICALLY
FILED
DOC#: _____
DATE FILED: ⸝3-27-18

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**CONTINENTAL CASUALTY COMPANY, et al.,**

**Plaintiffs,**

-against-

**HOPEMAN BROTHERS, INC.,**

**Defendant.**

---

**17-cv-00688 (ALC)**

**OPINION AND ORDER**

---

**ANDREW L. CARTER, JR., United States District Judge:**

A troop of plaintiffs filed suit against one defendant, Hopeman Brothers, Inc. ("Hopeman"), in New York state court. Before that action was filed, Hopeman sued two of the plaintiffs, Continental Casualty Company ("Continental") and Lexington Insurance Company ("Lexington"), for the same claim in the Eastern District of Virginia. That case is still pending. Hopeman removed the state action to the Southern District of New York on January 30, 2017, and it was assigned to this Court. Since the court in the Eastern District of Virginia enjoined Continental and Lexington from litigating the S.D.N.Y. action, Hopeman moves to dismiss those two plaintiffs from this case. In addition, Hopeman moves to compel arbitration against another set of plaintiffs and to transfer the case as to the remaining plaintiff to the Eastern District of Virginia. For the reasons that follow, Defendant's motions are GRANTED.

## BACKGROUND

I.      **Factual Background**

A.   **Insurance Policies**

Plaintiffs Continental and Lexington each issued Hopeman two three-year umbrella/excess general liability insurance policies, one covering the period from 1971 to 1974 and another covering the period from 1974 to 1977. Second Amended Complaint ¶¶ 13, 29

1

¶¶ 13, 29 (ECF No. 15) ("SAC"). Plaintiffs Certain London Market Insurance Companies ("LMCs") subscribed to one or more policies in favor of Hopeman. *Id.* ¶ 9; *see* Coverage Schedule for Certain London Market Insurance Companies (ECF No. 23-1).

## B. Asbestos-Related Claims

Beginning in 1979, Hopeman has been named in thousands of lawsuits brought by people claiming bodily injuries as a result of alleged asbestos exposure in materials supplied by Hopeman ("Asbestos-Related Claims"). SAC ¶ 37. Hopeman asserts that such claims will continue to be filed against Hopeman annually, and that, resultantly, it will continue to incur substantial defense costs and liability amounts relating to pending and future Asbestos-Related Claims. *Id.* ¶ 40.

Hopeman seeks insurance coverage under the policies issued by Plaintiffs concerning past, pending, and potential future Asbestos-Related Claims. *Id.* ¶¶ 43, 45. Plaintiffs contend that a significant portion of the Asbestos-Related Claims fall outside of their insurance policies. *Id.* ¶ 38.

Accordingly, Plaintiffs seek declaratory relief with respect to insurance coverage for Hopeman's Asbestos-Related Claims. *Id.* ¶ 47. Specifically, Plaintiffs' complaint requests declarations of their duties to (1) defend, (2) indemnify, and (3) reimburse Hopeman for Ultimate Net Loss and/or Excess Net Loss, as well as a declaration of the extent to which Hopeman has rights to coverage under Plaintiffs' policies. *Id.* ¶¶ 48-64.

## C. The Wellington Agreement

In response to the Asbestos-Related Claims, on June 19, 1985 numerous insurers and asbestos producers, including Hopeman, signed the Agreement Concerning Asbestos-Related Claims ("Wellington Agreement"). *Id.* ¶ 44; *see* Declaration of Jeffrey M. Johnson Ex. B (ECF

No. 23-2) ("Wellington Agreement"). The Wellington Agreement provides "for the administration, defense, payment and disposition of asbestos-related claims," in recognition of the "existence of numerous insurance coverage disputes between and among Insurers and Producers." Wellington Agreement at 4. Of the parties in this case, each LMC aside from Ocean Marine, as successor to Commercial Union, signed the Wellington Agreement. ("Wellington LMCs.") SAC ¶ 44. Along with Ocean Marine, Continental and Lexington are not signatories to the Wellington Agreement. *Id.*

The Wellington Agreement subjects "any disputed issues within the scope of the Agreement and the Appendices hereto" to Alternative Dispute Resolution ("ADR") as outlined in Appendix C of the Agreement. Wellington Agreement at VIII(6); *see* Wellington Agreement Appendix C (ECF No. 23-3) ("App'x C"). ADR under the Wellington Agreement involves three phases: "1) good faith negotiations, 2) a proceeding concluding with a binding decision if litigation is not allowed and a non-binding decision if litigation is allowed ("the Proceeding"); and 3) an appellate process for the binding decision." App'x C at 1. Thus, if the dispute is one for which litigation is allowed, it is subject to non-binding ADR. However, if the dispute is one for which litigation is prohibited, it is subject to binding ADR, i.e. arbitration.

The Wellington Agreement provides that most disputes are subject to arbitration. Under the Agreement, "[e]ach Subscribing Producer [Hopeman] and each Subscribing Insurer [Wellington LMCs] shall forego all claims for declaratory relief or damages as to [each other] relating to the application of insurance to the investigation, settlement, defense or indemnification of asbestos-related claims within the scope of the Agreement." Wellington Agreement at VIII(1).

However, "there are a limited number of issues with respect to which the possibility of

litigation is specifically provided for [in the Wellington Agreement]." *Id.* at VIII(4). Specifically, the Agreement provides that certain disputes concerning (1) pre-date insurance policies without deductible or retention limits that have per claim deductibles in excess of $25,000; (2) post-date insurance policies without deductible or retention limits; and (3) pre- and post-date insurance policies without aggregate limits, shall be resolved through "negotiation, followed by non-binding alternative dispute resolution, followed, if necessary, by litigation." *Id.* at XVI(A)(2), (B)(1); XVII(A)(2), (B).

### i. Wellington ADR Proceedings

Beginning in 2004, the Wellington LMCs were involved in a Wellington ADR proceeding initiated by Hopeman. *See* Declaration of Leslie A. Kilnapp, Ex. A ¶ 5 (ECF No. 27-1) ("Johnson Va. Decl."). According to Hopeman, four issues were in dispute: (1) whether the primary insurer's payments had been allocated to the Coverage Block in accord with the Wellington Agreement; (2) whether the indemnity payments should be classified as products or non-products claims; (3) whether Hopeman faced a liability to each individual claimant, and whether those claimants had a compensable injury; and (4) whether the amounts paid by the primary carrier for indemnity and defense was reasonable." Second Declaration of Jeffrey M. Johnson ¶ 4 (ECF No. 30) ("Second Johnson Decl."). Plaintiffs characterize the chief dispute as the exhaustion of underlying coverage, which in turn was impacted by whether claims were properly categorized as products claims—and thus subject to aggregates—or non-products claims—and thus potentially subject to multiple deductibles and retentions. Declaration of Leslie A. Kilnapp ¶ 5 (ECF No. 27) ("Kilnapp Decl."). According to Plaintiffs, other issues included the determination of injury during the policy period and whether the underlying policies had actually paid full limits. *Id.* ¶ 6.

Plaintiffs did not resolve their disputes with Hopeman during that ADR. *See* Pl Arbitration Mem at 6. Plaintiffs contend that the ADR was effectively abandoned in early 2012, but that the parties engaged in intermittent discussions from 2012 until December 2016. Kilnapp Decl. ¶¶ 3-4. Hopeman, in contrast, contends that the parties engaged in informal negotiations, as encouraged by the Wellington Agreement, during this period. Second Johnson Decl. ¶¶ 6; 8-9. At some point, Ocean Marine as well as Continental and Lexington were included in the discussions. Kilnapp Decl. ¶ 4.

In December 2016, Hopeman commenced a federal lawsuit in Virginia, described *infra*, against Continental and Lexington. *Id.* ¶ 9.

## II.     Procedural Background

On December 27, 2016, Hopeman—Defendant in this action—sued Continental and Lexington—Plaintiffs in this action—in the Eastern District of Virginia. *See* Complaint, *Hopeman Brothers, Inc., v. Continental Casualty Company, and Lexington Insurance Company*, No. 16-0187 (E.D. Va. Filed Dec. 27, 2016) ("Virginia Action"). The complaint sought declaratory judgments concerning the nature and scope of Hopeman's rights under insurance policies issued by Continental and Lexington with respect to Asbestos-Related Claims as well as damages for breach of contract. *See id.*

On January 4, 2017, Continental and Lexington, along with certain LMCs, sued Hopeman in New York Supreme Court, New York County. *See* Notice of Removal at 2 (ECF No. 1). Plaintiffs filed an amended complaint on January 18, 2017. New York Amended Complaint (ECF No. 1-1) ("N.Y. Compl."). Plaintiffs sought declaratory relief regarding "the rights and duties of the parties under various excess umbrella general liability insurance policies, issued to or subscribed in favor of Hopeman by Plaintiffs with respect to pending, past, and

future asbestos-related bodily injury claims that have or will be asserted against Hopeman." *Id.* ¶ 1. On January 30, 2017, Hopeman removed to this Court on diversity jurisdiction grounds. Notice of Removal. That action is henceforth known as the "New York Action."

In February 2017, the parties filed a series of motions in the Virginia Action. On February 1, 2017, Hopeman moved to enjoin the New York Action based on the "first-filed" rule, as followed in the Second and Fourth circuits, and to allow the case to proceed in Eastern District of Virginia. Mot. to Enjoin (Virginia Action ECF No. 12). On February 7, 2017, Continental and Lexington filed a motion to transfer the Virginia Action to the Southern District of New York and consolidate it with this New York Action. Mot. to Transfer (Virginia Action ECF No. 15). Briefing was completed and on April 17, 2017, the Honorable Mark S. Davis of the Eastern District of Virginia denied Continental and Lexingtons' motion to transfer the action to this Court. April 17, 2017 Opinion and Order at 22 (Virginia Action ECF No. 31) ("Virginia Order"). The Court also granted Hopeman's request to enjoin Continental and Lexington from pursuing the New York Action. *Id.* at 27. However, the Court denied Hopeman's request to enjoin the other plaintiffs in the New York Action (certain LMCs) because their claims related to the Wellington Agreement, which was not at issue in the Virginia Action. *Id.* The Court "[left] to the S.D.N.Y. the question of how to best proceed" in the New York Action. *Id.*

On April 20, 2017, this Court granted Plaintiffs leave to file a Second Amended Complaint ("SAC"). (ECF No. 10.) During a telephonic status conference on that date, it was determined that Continental and Lexington would not be included as Plaintiffs in the proposed SAC due to the injunction issued in the Virginia Action. (*See* ECF No. 11.) However, in a letter dated April 27, 2017, Plaintiffs stated they believed that Continental and Lexington should "technically remain as Plaintiffs in this action, in order to preserve their rights for possible future

litigation of their claims." *Id.* Nevertheless, Plaintiffs "recognize[d] that Continental and Lexington are currently enjoined from prosecuting the lawsuit before this Court." *Id.*

On April 28, 2017, Plaintiffs filed its SAC, keeping Continental and Lexington as Plaintiffs and substituting the name of one of the LMCs that had changed. (ECF No. 15).[1] This is the operative complaint in these proceedings.

Hopeman filed an answer on May 18, 2017. (ECF No. 17.) Also that day, Hopeman filed a motion to dismiss Continental and Lexington and to transfer this case to the Eastern District of Virginia. (ECF Nos. 18-20) ("Def Venue Mem") and a motion to compel arbitration pursuant to the Wellington Agreement (ECF Nos. 21-23) ("Def Arbitration Mem"). On June 8, 2017, Plaintiffs filed motions in opposition to the motion to dismiss and transfer (ECF Nos. 24-25) ("Pl Venue Mem") and to the motion to compel arbitration (ECF Nos. 26-27) ("Pl Arbitration Mem"). Hopeman filed reply briefs in support of both motions on June 15, 2017.[2] (ECF Nos. 28-29.) ("Def Venue Reply"; "Def Arbitration Reply.")

Accordingly, the Court considers this matter fully submitted.

## DISCUSSION

### I.        Motion to Compel Arbitration

Hopeman contends that the Wellington LMCs must arbitrate their claims because they fall within the Wellington Agreement's arbitration provisions. Plaintiffs argue that the Wellington Agreement's arbitration clause does not apply to their claims, and that in any event

---

[1] The SAC replaced "Commercial Union Assurance Company PLC" with "The Ocean Marine Insurance Company Ltd." as its successor. (ECF No. 11 at 2.)

[2] Hopeman also filed a supplemental declaration. (ECF No. 30.) Plaintiffs filed a letter objecting to paragraph 7 of that declaration, which references a privileged and confidential settlement agreement to which no Plaintiffs in this case were a party. (ECF No. 31.). Hopeman responded, asserting that the reference was proper to show that the Wellington negotiation phase remained open and resulted in many settlements, and therefore the paragraph should not be stricken. (ECF No. 32.) This Court has only considered paragraph 7 to the extent that it evidences continuing discussions between the parties. Even if it had stricken paragraph 7, the Court's analysis would remain the same.

Hopeman has waived the Agreement's arbitration provisions. For the reasons discussed below, Hopeman's motion to compel arbitration is granted.

### A. Legal Standard

"There is a strong federal policy favoring arbitration as an alternative means of dispute resolution." *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) (quoting *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F. 3d 72, 76 (2d Cir. 1998), *abrogated on other grounds by Katz v. Cellco Partnership*, 794 F.3d 341 (2d Cir. 2015)). The Federal Arbitration Act ("FAA") creates "'a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the act.'" *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). The FAA provides that "[a] written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2.

The threshold question is whether the dispute at issue is arbitrable. This "'[q]uestion[] of arbitrability' is a term of art" that covers (1) "'dispute[s] about whether the parties are bound by a given arbitration clause'" as well as (2) "'disagreement[s] about whether an arbitration clause in a concededly binding contract applies to a particular type of controversy,'" i.e. questions of scope. *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002)). Questions of arbitrability are presumptively resolved by courts, rather than the arbitrator, unless "the parties clearly and unmistakably provide otherwise.'" *Howsam*, 537 U.S. at 83 (quoting *AT&T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649 (1986)). With respect to questions of scope, "[i]t is almost always the court which decides whether the arbitration agreement applies to the

particular dispute." *Abram Landau Real Estate v. Bevona*, 123 F.3d 69, 72 (2d Cir. 1997) (citation and internal quotation marks omitted).

If the parties did not "clearly and unmistakably" provide that the question of arbitrability should be decided by the arbitrator, the court must then determine whether the relevant issues are subject to arbitration. The court must resolve these questions "with a healthy regard for the federal policy favoring arbitration." *Chevron*, 638 F.3d at 393 (quoting *Moses H. Cone,* 460 U.S. at 24).

In determining whether a particular dispute falls within the scope of an arbitration clause, a court should first "classify the particular clause as either broad or narrow." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001) (collecting cases). When reviewing a narrow clause, a court "must determine whether the dispute is over an issue that 'is on its face within the purview of the clause,' or over a collateral issue that is somehow connected to the main agreement that contains its arbitration clause." *Id.* (citations omitted). With respect to narrow clauses, "a collateral matter will generally be ruled beyond its purview." *Id.* (citation omitted). However, when reviewing a broad clause, "'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim alleged 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Id.* (citation omitted).

In short, "[t]he existence of a broad arbitration clause creates a presumption of arbitrability which can be overcome only if it may be said 'with positive assurance' that the arbitration clause is not susceptible to the interpretation that it covers the asserted dispute." *Orange Cnty. Choppers, Inc. v. Goen Technologies Corp.*, 374 F. Supp. 2d 372, 374 (S.D.N.Y. 2005) (quoting *Oldroyd*, 134 F.3d at 76). In contrast, if "the clause is 'narrow,' arbitration

should not be compelled unless the court determines that the dispute falls within the clause." *Prudential Lines, Inc. v. Exxon Corp.*, 704 F.2d 59, 64 (2d Cir. 1983).

In determining whether an arbitration agreement is broad or narrow, "[s]pecific words or phrases alone may not be determinative, although words of limitation would indicate a narrower clause." *Id.* "In the end, a court must determine whether, on the one hand, the language of the clause, taken as a whole, evidences the parties' intent to have arbitration serve as the primary recourse for disputes connected to the agreement containing the clause, or if, on the other hand, arbitration was designed to play a more limited role in any future dispute." *Louis Dreyfus Negoce*, 252 F.3d at 225 (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

Finally, if "the scope of an arbitration agreement is ambiguous, the Federal Arbitration Act's policy favoring arbitration requires that 'any doubts . . . be resolved in favor of arbitration.'" *Bell*, 293 F.3d at 566 (quoting *Moses H. Cone*, 460 U.S. at 24-25).

## B. Application

### i. Determination of Arbitrability

Here, the Wellington Agreement does not explicitly relegate the question of arbitrability to the arbitrator. Moreover, since this dispute centers on questions of scope, arbitrability is presumptively a question for the Court. *See Abram Landau Real Estate*, 123 F.3d at 72.[3] Accordingly, this Court is tasked with determining whether the arbitration clause applies to the

---

[3] While Plaintiffs claim that "the Wellington Agreement is not an arbitration agreement," Pl Arbitration Mem at 17, they appear to argue that it is not *solely* an arbitration agreement. Plaintiffs do not contest that "certain disputes are subject to a binding decision by non-judicial third parties." *Id.* Accordingly, this Court construes Plaintiffs' argument as contesting the scope of the agreement, rather than the existence of one. To the extent that Plaintiffs contest whether the Wellington Agreement contains an arbitration clause, this Court holds that it does contain an arbitration clause. *See Porer Hayden Co. v. Century Indem. Co.*, 136 F.3d 380, 382 (4th Cir. 1998) (holding that Wellington Agreement "is a 'contract evidencing a transaction involving commerce,' and therefore the scope of its arbitration clause is determined in accordance with the Federal Arbitration Act (FAA)").

Wellington LMCs' claims.

### i. Breadth of Arbitration Clause

The next issue is the breadth of that arbitration clause. Hopeman contends that the arbitration agreement is broad, providing that the parties "'shall' arbitrate 'any disputed issues' within the scope of the agreement." Def Arbitration Mem at 13-14. Plaintiffs contend that the Wellington Agreement is not an arbitration agreement, but rather "essentially an accord that provides a framework for resolving [asbestos-related bodily injury claim] coverage disputes." Pl Arbitration Mem at 7. While Plaintiffs concede that the Agreement "certainly contains clauses relating to the arbitrability of certain issues," they contend that "these clauses are narrowly prescribed." *Id.* Specifically, "[t]he Wellington Agreement only concerns itself with bodily injury claims arising out of asbestos exposure." *Id.* at 17. Accordingly, Plaintiffs argue, the arbitration clause is narrow.

Here, the Wellington Agreement's arbitration clause is broad. The Wellington Agreement subjects "any disputed issues" within its scope between subscribing producers (which includes Hopeman) and subscribing insurers (which includes the Wellington LMCs) to ADR, and any dispute "relating to the application of insurance to the investigation, settlement, defense or indemnification of asbestos-related claims within the scope of the Agreement" to arbitration. Wellington Agreement at VIII(6); (1). The Agreement provides only a narrow exception from arbitration for a "*limited* number of issues with respect to which the possibility of litigation is *specifically* provided for herin." *Id.* at VIII(4) (emphasis added).

The breadth of language in VIII(1), compared with the narrow exception for litigation in VIII(4), evinces the breadth of the arbitration clause. Moreover, the claims covered by section VIII(1) directly relate to the purpose of the Wellington Agreement: "to provide for the

administration, defense, payment, and disposition of asbestos-related claims." *Id.* at 4. Finally, this Court notes that both this Circuit and the Fourth Circuit have held that the Wellington Agreement is broad. *See U.S. Fire Ins. Co. v. National Gypsum Co.*, 101 F.3d 813, 817 (2d Cir. 1996) ("Important to the present case is Wellington's broad arbitration clause . . ."); *Porter Hayden*, 136 F.3d at 384 (The "heavy federal presumption of arbitrability applies" to the Wellington Agreement's arbitration clause.) Thus, "although 'not unlimited[,]'" the arbitration clause here is broad. *See Louis Dreyfus Negoce*, 252 F.3d at 225.

### ii.   Whether This Dispute Falls Within the Scope of the Arbitration Agreement

Since the arbitration clause at issue is broad, this Court "must apply a strong presumption of arbitrability." *Alemac Ins. Serv's., Inc. v. Risk Transfer, Inc.*, No. 03-1162, 2003 WL 22024070, at *4 (S.D.N.Y. Aug. 28, 2003) (citing *Oldroyd*, 134 F.3d at 76).

Here, it cannot be said with "positive assurance" that Plaintiffs' claims fall outside of the arbitration clause. *See Oldroyd*, 134 F.3d at 76. Plaintiffs seek declaratory relief "with respect to pending, past, and future asbestos-related bodily injury claims that have or will be asserted against Hopeman." SAC ¶ 1. This relates to the heart of the arbitration provision in the Wellington Agreement.

Even if the arbitration clause were considered narrow, this Court would still determine that the dispute falls within the scope of the arbitration agreement because Plaintiffs' claims are not "collateral" to the arbitration clause.

Plaintiffs contend that major issues in this litigation are not subject to the arbitration clause and thus may be litigated. Specifically, they raise issues under Sections XVI and XVII of the Wellington Agreement regarding (1) whether the underlying claims have been properly categorized as "products claims" and "the effect of number of occurrences" for post-date policies

and (2) whether primary policies contain applicable aggregates for non-products and application of deductibles or retentions in primary policies for pre-date policies. Pl Arbitration Mem at 14; 19.

Hopeman contests that either Section XVI (concerning policies without deductible or retention limits) or XVII (concerning policies without aggregate limits) apply here. First, Hopeman states that Section XVI is inapplicable because the Wellington LMCs subscribed to "various excess umbrella general liability insurance policies"—which have neither deductibles nor retentions. Def Arbitration Reply at 4-5 & n.3. Second, Hopeman contends that Section XVII is inapplicable because each policy subscribed to by the Wellington LMCs has aggregate limits for "products" and/or "completed operations" liability insurance. *Id.* at 5. Hopeman further states that is has no disputes with its primary insurer, Liberty Mutual Insurance Company ("Liberty Mutual") regarding these provisions, and in any event such disputes would not be relevant to this case. *Id.* at 4-6. Chiefly, Hopeman argues that Plaintiffs' reading of Sections XVI and XVII would allow the exception to arbitration to swallow the rule, by permitting plaintiffs to litigate any time they argue that underlying coverage is not properly exhausted—one of the most frequent excess insurer arguments. *Id.* at 7.

Here, Plaintiffs' arguments are unavailing. This dispute pertains to the parties' rights and obligations with respect to asbestos-related bodily injury claims, the precise area covered by the arbitration clause. To the extent that there is any uncertainty as to whether the arbitration clause applies, "we are instructed that 'any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Collins & Aikman Products Co. v. Building Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995) (quoting *Moses H. Cone*, 460 U.S. at 24-25). Accordingly, this Court determines that Plaintiffs' claims fall within the scope of the arbitration agreement.

### iii. **Whether Hopeman Waived Arbitration**

"[T]he presumption is that the arbitrator should deicde 'allegation[s] of waiver, delay, or a like defense to arbitrability." *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (quoting *Moses H Cone*, 460 U.S. at 24-25); *accord Grandon v. Merrill Lynch and Co., Inc.*, No. 95-10742, 2005 WL 823922, at *1 (S.D.N.Y. Apr. 7, 2005). However, "the Second Circuit has explicitly held that 'where the waiver defense [is] based on prior litigation by the party seeking arbitration . . . the court should decide the issue of waiver.'" *LG Electronics, Inc. v. Wi-LAN USA, Inc.*, No. 13-2237, 2014 WL 3610796, at *3 (S.D.N.Y. July 21, 2014) (collecting cases).

This Circuit "has set forth a three-part test for determining the waiver question: '(1) the time elapsed from the commencement of litigation to the request for arbitration, (2) the amount of litigation (including any substantive motions and discovery), and (3) proof of prejudice.'" *Ralph Lauren Co. v. U.S. Polo Ass'n, Inc.*, No. 13-7147, 2014 WL 4377852, at *5 (S.D.N.Y. Sept. 4, 2014) (quoting *PPG Industries, Inc. v. Webster Auto Parts, Inc.*, 128 F.3d 103, 107 (2d Cir. 1997)). The "key to a waiver analysis is prejudice." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.*, 310 F.3d 102, 105 (2d Cir. 2002). Prejudice can be (1) substantive, for instance if "a party loses a motion on the merits and then attempts, in effect, to relitigate the issue by invoking arbitration" or (2) based on "excessive cost and time delay." *Id.* (quoting *Kramer v. Hammond*, 943 F.2d 176, 179 (2d Cir. 1991)).

Plaintiffs argue that Hopeman "effectively abandoned the ADR" and waived its right to arbitration when it stopped pursuing any further remedies under Wellington or its timetable in 2012 and, subsequently in 2016, commenced litigation. Pl Arbitration Mem at 6-7; 14. Hopeman contends that Plaintiffs cannot avoid their obligation to arbitrate "simply by asserting that Hopeman has breached the Wellington Agreement." Def Arbitration Mem at 15. Further,

Hopeman notes that it only sued Continental and Lexington—neither of which were signatories to the Wellington Agreement. Def Arbitration Reply at 8-9. Finally, Hopeman argues that its informal negotiations complied with the spirit of the Wellington Agreement ADR procedure, which was intended "to encourage a negotiated result rather than use of ADR." *Id.* at 9 (citing App'x C).

To the extent Plaintiffs argue that Hopeman waived its right to arbitration by initiating the Virginia lawsuit, this Court has authority to decide the issue of waiver. *See LG Electronics*, 2014 WL 3610796, at *3. The Court holds that Hopeman has not waived its right to arbitration since it only sued parties that were not signatories to the Wellington Agreement, and thus whom it could not compel to arbitration. Any other issues of waiver are properly left to the arbitrator. If this Court had jurisdiction to consider those arguments, it would also reject them because Plaintiffs have not demonstrated prejudice. *See id.* at *4.

Accordingly, Hopeman's motion to compel arbitration with respect to the Wellington signatory Plaintiffs is granted.[4]

## II. Motion to Dismiss Continental and Lexington

Hopeman asserts that Continental and Lexington must be dismissed from this action. Hopeman notes that the Eastern District of Virginia enjoined Continental and Lexington from pursuing their claims in this forum, and accordingly their appearance on this complaint directly violates that order. Def Venue Mem at 12 (citing Virginia Order at 22, 27-28). Further, Hopeman contends that Continental and Lexington have no declaratory judgment claims in this action that present issues separate from those in the Virginia action; thus, there is no reason to preserve the possibility of their involvement in this case at a later date. Plaintiffs argue that

---

[4] In light of this holding, this Court need not determine whether it has the power to compel non-binding arbitration for issues not subject to binding arbitration.

Continental and Lexington should technically remain in this action to preserve their rights for possible future litigation of their claims. Pl Venue Mem at 8 (citing Declaration of Eileen T. McCabe Ex. B at 1 (ECF No. 25-2)). This is because they cannot predict how or when the Virginia action will end. *Id.*

Here, Hopeman has the better of the argument. Having been validly enjoined from prosecuting this action, Continental and Lexington cannot remain named parties in this case. *See Doctor's Associates, Inc. v. Qasim*, 144 F. Supp. 2d 112, 114 (D. Conn. 2001) (ordering non-enjoined plaintiffs to, "by an appropriate amendment of the complaint, remove any reference or naming of [enjoined plaintiffs] in the caption or body of the complaint"); *see also Klapper v. Verizon Comm's, Inc.*, No. 02-3262, 2002 WL 1580019, at *1 (S.D.N.Y. July 16, 2002) (granting motion to dismiss complaint filed in contravention of decision "enjoining plaintiff from instituting further actions arising from the facts at issue"). Further, since Continental and Lexingtons' claims here are essentially identical to those currently being litigated in Virginia, and in any event, as discussed *infra*, this Court is granting Hopeman's motion to transfer this action to Virginia, there are no rights left for Continental and Lexington to preserve in this Court. Accordingly, Continental and Lexington are dismissed from this action.

## III.  Motion to Change Venue

### A. Legal Standard

Twenty-eight U.S.C. 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." District courts "have broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a

case-by-case basis." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006) (citation omitted).

Courts engage in a two-part inquiry to determine a change of venue. First, a court determines "whether the action to be transferred 'might have been brought' in the transferee court.'" *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc.*, 415 F. Supp. 2d 370, 373 (S.D.N.Y. 2006) (citing *Berman v. Informix Corp.*, 30 F. Supp. 2d 653, 656 (S.D.N.Y. 1998)). Second, a court assesses whether transfer is warranted "for the convenience of parties and witnesses and in the interests of justice." *Id.* (citation omitted). In the latter inquiry, courts generally assess the following factors:

> (a) the plaintiff's choice of forum, (b) the convenience of witnesses, (c) the location of relevant documents and relative ease of access to sources of proof, (d) the convenience of the parties, (e) the locus of operative facts, (f) the availability of process to compel the attendance of unwilling witnesses, (g) the relative means of the parties, (h) the forum's familiarity with the governing law, and (i) trial efficiency and the interest of justice, based on the totality of the circumstances.

*Liberty Mut. Ins. Co. v. Fairbanks Co.*, 17 F. Supp. 3d 385, 395 (S.D.N.Y. 2014) (citation omitted). "There is no rigid formula for balancing these factors and no single one of them is determinative." *Indian Harbor Ins. Co. v. Factory Mut. Ins. Co.*, 419 F. Supp. 2d 395, 402 (S.D.N.Y. 2005) (citations omitted).

The party requesting a change in venue "carries the burden of making out a strong case for transfer." *N.Y. Marine and General Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (citation and internal quotation marks omitted). The "plaintiff's choice of forum should not be disturbed unless the balance of the factors tips heavily in favor of transfer." *Liberty Mut. Ins. Co.*, 17 F. Supp. 3d at 396 (citations and internal quotation marks omitted). The Circuit has determined that it is "appropriate" to apply a "clear and convincing evidence standard." *N.Y. Marine and General Ins. Co.*, 599 F.3d at 113-14 (collecting cases).

**B. Application**

> **i. Whether This Action Could Have Been Brought in the Eastern District of Virginia**

Plaintiffs contest subject-matter jurisdiction in the Eastern District of Virginia because the amount-in-controversy requirement has not been met.[5]

A court has subject matter jurisdiction based on diversity of citizenship if (1) the matter concerns citizens of different States or citizens of a State and citizens of a foreign state and (2) the amount in controversy exceeds $75,000, exclusive of interests and costs. 28 U.S.C. § 1332(a). The party asserting federal jurisdiction "has the burden of proving that it appears to a 'reasonable probability' that the claim is in excess of the statutory jurisdictional amount." *Scherer v. Equitable Life Assurance Society of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir. 1994)). In a case involving removal, a court looks "first to the plaintiffs' complaint and then to [defendant's] petition for removal" to determine the amount in controversy. *Mehlenbacher v. Akzo Nobel Salt, Inc.*, 216 F.3d 291, 296 (2d Cir. 2000) (citation omitted).

Plaintiffs contend that, if the Wellington LMCs are compelled to arbitration (as this Court now holds), the Eastern District of Virginia would lack jurisdiction over Ocean Marine's claims because the amount in controversy between Ocean Marine and Hopeman does not exceed $75,000. Pl Venue Mem at 5; 11. Plaintiffs note that Hopeman alleges that Ocean Marine "has only a de minimis share of the London policies." *Id.* (citing Def Venue Mem at 6 n.2.) Hopeman contends that the amount in controversy exceeds $75,000: Ocean Marine's policy limits are at least $4,072,722 and it had billed for and was in arrears on its obligations to

---

[5] The parties do not dispute that Hopeman and the LMCs are citizens of different states. According to the SAC, the LMCs are "organized under the law of foreign states, each having its principal place of business outside the United States," while Hopeman is a citizen of Virginia. SAC ¶¶ 4-5.

Hopeman in the amount of $443,415. Def Venue Reply at 7-8 (citing Pl Arbitration Mem at 13; Second Johnson Decl. ¶ 12).

Here, Hopeman has met its burden of showing a reasonable probability that the amount in controversy exceeds $75,000. Accordingly, the Eastern District of Virginia would have jurisdiction over this matter.

### ii. Whether the Balance of Factors Tips Decidedly in Defendant's Favor

### 1. The Plaintiff's Choice of Forum

Generally, a plaintiff's choice of forum "is entitled to significant consideration and will not be disturbed unless other factors weigh strongly in favor of transfer." *Indian Harbor*, 419 F. Supp. 2d at 405 (citation omitted). "However, plaintiffs' chosen forum carries less weight when no party resides in the forum nor is it the locus of operative facts. *Id.* at 405-06 (collecting cases); *accord Walker v. Jon Reneau Collection, Inc.*, 423 F. Supp. 2d 115, 118 (S.D.N.Y. 2005) ('[A] foreign resident's choice of a U.S. forum should receive less consideration' than a plaintiff suing in his or her own home forum.") (quoting *Iragorri v. United Technologies Corp.*, 274 F. 3d 65, 71 (2d Cir. 2001) (en banc)).

Here, Plaintiffs chose to litigate in New York Supreme Court, and Hopeman removed the case to this Court. Thus, this Court was not Plaintiffs' chosen forum. *See Zaitsev v. State Farm Fire & Cas. Co.*, No. 05-2098, 2005 WL 3088326, at *3 (E.D.N.Y. Nov. 17, 2005) (noting Plaintiffs' "original forum choice" was state, not federal court). Moreover, in light of this Court's rulings above, the only plaintiff currently litigating this matter is Ocean Marine. Ocean Marine is not a citizen of New York.[6] Accordingly, Plaintiffs' choice of forum is afforded less weight.

---

[6] Plaintiffs do not specify where Ocean Marine is domiciled. Hopeman asserts that "[t]he insurers are variously based in the United Kigndom, Illinois, and Massachusetts." Def Venue Mem at 14.

## 2. The Convenience of Witnesses

"Convenience of both the party and non-party witnesses is probably the single-most important factor in the analysis of whether transfer should be granted." *Fuji Photo Film*, 415 F. Supp. 2d at 373 (quoting *Berman*, 30 F. Supp. 2d at 657). The "convenience of non-party witnesses is accorded more weight than that of party witnesses." *Indian Harbor Ins. Co.*, 419 F. Supp. 2d at 402 (citations omitted). In conducting this analysis, "'a court does not merely tally the number of witnesses who reside in the current forum in comparison to the number located in the proposed transferee forum. Instead, the court must qualitatively evaluate the materiality of the testimony that the witnesses may provide.'" *ESPN, Inc. v. Quiksilver, Inc.*, 581 F. Supp. 2d 542, 547 (S.D.N.Y. 2008) (citations omitted).

Plaintiffs note that Hopeman has not identified a single witness or their testimony. Hopeman contends that the Eastern District of Virginia is "far more convenient for Hopeman and its witnesses, as well as any other witnesses who might be deposed to testify in both cases." Def Venue Mem at 14.

Since Hopeman has not specifically identified witnesses that would testify, whether Virginia or New York would be more convenient for those witnesses, or whether they would be expected to testify in both cases, this factor is neutral. *See Liberty Mut. Ins. Co.*, 17 F. Supp. 3d at 396 (convenience of witnesses is "neutral" because defendant "has not identified a single potential witness[] or indicated what any witness's testimony would cover").

## 3. The Location of Relevant Documents and Relative Ease of Access to Sources of Proof

While the location of relevant documents and sources of proof remains a separate factor for consideration, it "is largely a neutral factor in today's world of faxing, scanning, and emailing documents." *AIG Financial Products Corp. v. Public Utility Dist. No. 1 of Snohomish Cnty.*,

*Wash.*, 675 F. Supp. 2d 354, 371 (S.D.N.Y. 2009) (quoting *Am. S.S. Owners Mut. Prot. & Indem. Ass'n v. Lafarge N. Am., Inc.*, 474 F. Supp. 2d 474, 484 (S.D.N.Y. 2007)).

Hopeman notes that the LMCs are variously based in the United Kingdom, Illinois, and Massachusetts, and an entity that manages Asbestos-Related Claims for the LMCs is based in Massachusetts, while Hopeman and its local counsel for Asbestos-Related Claims are based in Virginia, where certain documents regarding those claims are maintained. Def Venue Mem at 14-15. However, such documents could easily be faxed, scanned or emailed. Since Hopeman "has not indicated any special circumstances that would cause this factor to weigh in its favor," this factor is neutral. *See AIG.*, 675 F. Supp. 2d at 370.

#### 4. The Convenience of the Parties

The "convenience of the parties favors transfer when transfer would increase convenience to the moving party without generally increasing the inconvenience to the non-movant." *Liberty Mut. Ins. Co.*, 17 F. Supp. 3d at 399 (citation omitted). However, "'[t]he parties' convenience becomes a neutral factor in the transfer analysis if transferring venue would merely shift the inconvenience to the other party.'" *Id.* (citation omitted).

Here, Hopeman is located in Virginia, and is already litigating in that forum. No party has its principal place of business in New York.

Plaintiffs contend that New York is more convenient because (1) Hopeman states that it is a "non-operating company," making it unclear how or why Virginia would be more convenient, and (2) Hopeman's counsel, Black Rome, has an office in New York City and its counsel in New York is counsel of record in this case. Pl Venue Mem at 13.

Given that it is located in Virginia and currently litigating in Virginia, transferring this case to the Eastern District of Virginia would greatly convenience Hopeman. The pleadings do

not clearly indicate where Ocean Marine is domiciled; thus, the Court cannot assess whether transfer would severely inconvenience it. Accordingly, this factor counts slightly in favor of transfer.

### 5. The Locus of Operative Facts

The "locus of operative facts is a 'primary factor' in determining whether to transfer venue." *Am. Steamship*, 474 F. Supp. 2d at 485 (citations omitted). "When assessing the locus of operative facts in insurance coverage disputes, courts typically emphasize the site of negotiations, purchase, and delivery of the policy in question." *Liberty Mut. Ins. Co.*, 17 F. Supp. 3d at 396 (collecting cases).

Here, some of the London Policies at issue were subscribed in favor of Hopeman in 1977, while it was headquartered in New York, and others were subscribed after 1977, while Hopeman was headquartered in Virginia. Pl Venue Mem at 14. Hopeman contends that all of the policies to which Ocean Marine—the only remaining Plaintiff—subscribed were issued after Hopeman's headquarters moved to Virginia. Def Venue Mem at 17.

Hopeman additionally argues that the majority of Asbestos-Related Claims have been filed in Virginia. Def Venue Mem at 15. However, in an insurance case such as this, "the locus in question is the site of 'the execution of the [insurance] contract, not the location of the incident which triggered the insurance claim.'" *Am. Steamship*, 474 F. Supp. 2d at 485 (citation omitted).

Accordingly, this factor counts slightly in favor of Hopeman.

### 6. The Availability Of Process to Compel the Attendance of Unwilling Witnesses

This factor "requires a consideration of the court's power to compel attendance of unwilling witnesses, as a district court only can subpoena witnesses within the district or within 100 miles of the district." *Fuji Photo Film*, 415 F. Supp. 2d at 375 (citing Fed. R. Civ. P.

45(b)(2)). Here, the parties agree that neither New York nor Virginia would be preferable for compelling "unwilling witnesses." Accordingly, this factor is neutral.

### 7. The Relative Means of the Parties

"'In determining whether the relative means of the parties weighs in favor of transfer, a court should determine whether a party's financial situation would meaningfully impede its ability to litigate th[e] case in either forum.'" *Liberty Mut.*, 17 F. Supp. 3d at 399 (quoting *AIG*, 675 F. Supp. 2d at 371).

Hopeman avers it is a "non-operating company" with "limited non-insurance resources" whose "continued existence is focused on defending and resolving Asbestos-Related Claims." Johnson Decl. ¶ 6. Plaintiffs note, however, that Hopeman has retained Blank Rome LLP, one of the largest law firms in the United States, to represent it in this lawsuit and the Virginia suit. Pl Venue Mem at 15.

Plaintiffs do not acknowledge their own relative means. However, Hopeman contends that Plaintiffs are better suited to litigate on multiple fronts based on their affiliation with the National Indemnity Company and Berkshire Hathaway, Inc. Def Venue Mem at 16.

Accordingly, this factor is neutral.

### 8. The Forum's Familiarity With the Governing Law

A "forum's familiarity with the governing law is typically 'to be accorded little weight on a motion to transfer venue because federal courts are deemed capable of applying the substantive law of other states.'" *Liberty Mut.*, 17 F. Supp. 3d at 398 (citation omitted).

Whether or not this case is transferred, "any choice-of-law analysis will be conducted under New York choice-of-law rules." *Id.* (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)). Under New York law, "courts must apply the law of the state 'which has the most

significant contacts with the matter in dispute.'" *Royal Ins. Co. of Amer. v. Tower Records, Inc.*, No. 02-2612, 2002 WL 31385815, at *7 (S.D.N.Y. Oct. 22, 2002) (quoting *Olin Corp. v. Ins. Co. of N. Amer.*, 743 F. Supp. 1044, 1048 (S.D.N.Y. 1999)). "In determining which state's law to apply in cases involving insurance contracts, New York courts have considered the following factors: (1) the location of the insured risk; (2) the policyholder's principal place of business; (3) where the policy was issued and delivered; (4) the location of the broker placing the policy; (5) where the premiums were paid; and (6) the insurer's place of business." *Id.* (collecting cases).

Here, this analysis may require a court to apply either New York or Virginia law. This Court need not determine which state's law applies to each claim at this point. *See Liberty Mut.*, 17 F. Supp. 3d at 398 ("it would be premature to determine at this stage which state's substantive law will apply"). Regardless, this Court is capable of applying New York or Virginia law and the Eastern District of Virginia court has already indicated that it is capable of applying either state's law. *See* Virginia Order at 21. Accordingly, this factor is neutral.

### 9. Trial Efficiency and the Interest of Justice, Based on the Totality of the Circumstances.

This factor is "based on the totality of the circumstances," and "relates primarily to issues of judicial economy." *Indian Harbor*, 419 F. Supp. 2d at 407 (citations omitted). "Issues of judicial economy and avoiding inconsistent results in related actions can be decisive, even when most [other] factors would ordinarily sustain a plaintiff's choice of forum." *JetBlue Airways Corp. v. Helferich Patent Licensing, LLC*, 960 F. Supp. 2d 383, 400 (E.D.N.Y. 2013) (citation and internal quotation marks omitted). Indeed, "[i]t is well established that the existence of a related action pending in the transferee court weighs heavily towards transfer." *APA Excelsior III L.P. v. Premiere Technologies, Inc.*, 49 F. Supp. 2d 664, 668 (S.D.N.Y. 1999) (collecting cases). Additionally, while "certainly not decisive, docket conditions or calendar congestion of

24

both the transferee and transferor districts is a proper factor and is accorded some weight." *Indian Harbor*, 419 F. Supp. 2d at 407 (citation and internal quotation marks omitted).

Here, the interests of judicial efficiency counsel significantly in favor of transferring this action. First, litigation between Continental, Lexington, and Hopeman is ongoing in the Eastern District of Virginia. *See* Virginia Order at 26-27. That court is already familiar with the common facts underlying both actions. Meanwhile, only one plaintiff is now litigating in this forum. Moreover, since the Wellington LMCs are compelled to arbitration, it is immaterial that the Virginia court is not familiar with the Wellington Agreement.

Second, "it has been noted that the Southern District of New York is one of the busiest courts in the nation." *Royal & Sunalliance v. British Airways*, 167 F. Supp. 2d 573, 579 (S.D.N.Y. 2001) (citation omitted). In comparison, the Eastern District of Virginia's docket is less crowded and moves more quickly. *See* Def Venue Mem at 19.

Plaintiffs contend that "the interests of justice are not served by forum-shopping intended to take advantage of [the Eastern District of Virginia's] so-called 'rocket docket.'" Pl Venue Mem at 16 (collecting cases). While true, the fact that the Eastern District of Virginia held that Hopeman's choice of forum was due "substantial weight" because the district "is significantly related to the cause of action" cuts against this argument. *See* Virginia Order at 12-13.

Accordingly, this factor counts in favor of transferring this action.

After weighing these factors, the Court determines that Hopeman has met its burden of showing that this action should be transferred to the Eastern District of Virginia. Each factor besides judicial efficiency is either neutral or counts slightly toward Hopeman. Judicial efficiency, which can be decisive—particularly when a related action is pending in the transferee forum—counts significantly in favor of transfer. *See JetBlue Airways*, 960 F. Supp. 2d at 400.

Accordingly, Defendant's motions to compel the Wellington LMCs to arbitration, dismiss Continental and Lexington, and transfer this action to the Eastern District of Virginia are GRANTED. The proceedings as to the Wellington LMCs are hereby stayed pending arbitration. *See Katz v. Cellco Partnership*, 794 F.3d 341, 342 (2d Cir. 2015); *Plazza v. Airbnb, Inc.*, No. 16-1085, 2018 WL 583122, at *15 (S.D.N.Y. Jan. 26, 2018).

The Clerk of Court is respectfully requested to terminate the motions at ECF Nos. 18 and 21.

**SO ORDERED.**

**Dated**:    March 27, 2018
             New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**